The first is United States of America v. Craig St. Clair. Counsel, you may begin. May it please the Court, my name is Karen Landau and I represent repellent. The sentence in this case must be vacated for two reasons. First, the district court calculated an unreasonable estimation of the amount of intended loss. Second, Mr. St. Clair did not get the effective assistance of counsel at sentencing in that his attorney failed to recognize a clearly available basis for a downward departure, but did not make the motion. Do we know why? We don't know why. Isn't it a classic case that it has to be brought by way of habeas? No, Your Honor, because there couldn't be a strategic reason not to. He knew, I mean, I'll just do it in reverse order since you asked the question. It was clear counsel moved to – counsel challenged the Court's ruling that the prior convictions were not related, and he challenged the calculation of criminal history points. And the guideline provision clearly says that there may be cases in which a defendant's criminal history score overrepresents the seriousness of his criminal history. There's an Eighth Circuit case that addresses a downward departure in exactly this situation where the Eighth Circuit found that a departure for overrepresentation could be appropriate, where you have multiple convictions that essentially resulted in one sentence, but resulted in a large number of criminal history points. You're talking in terms of mays and could-bes. Sounds like some kind of room here for differences of opinion. Well, I mean, the standard is reasonable probability. I don't have to show that Mr. St. Clair would have gotten a downward departure. I only have to show that there's a reasonable probability, if it had been requested, the Court would have granted it. Here it wasn't requested. There – I mean, in this situation, you know, this Court does not need to – we don't manufacture strategic reasons why counsel didn't do something. Yes. So tell me exactly how this works. You've identified one discrete area where you think there was a mistake at sentencing by counsel. Yes. How does it work? Do we undo the entire sentencing if we were to agree with you, or do we undo just that part? How does that work? I hadn't considered that. Well, I know. I've been thinking about that. That's – Well, of course, in this case, I believe the entire sentence has to be vacated because of the loss issue. But I believe actually – actually, on reflection, you would remand for a complete resentencing. Complete resentencing with a new lawyer. Yes, with a new lawyer. Even though the rest of it is all right. You can't parse it out. You can't pass that the rest of it is all right. But even if you found that the rest of it was – is all right, it's a complete resentencing. That's the remedy you would get on 2253. Have you found any cases that give us any guidance in this respect on how we do that? You know, I don't. And I can't recall offhand. The case that is closest on point is the Headley case from the Third Circuit, which is not a departure case, but it is a failure. It was a – it found ineffective because it was on direct appeal for the failure to request a downward adjustment for a minor role. And I cannot recall off the top of my head if they remanded for a complete resentencing, but I'd be happy to submit a letter to the Court. You know, it just – it seems at one level that it would make more sense just to send it back for resentencing with a new counsel on that discrete issue, if that's the only one that we think is a problem, rather than just undo the whole thing and start all over again. I mean, the fact that a mistake was made in one particular area, does that necessarily mean the whole thing is defective? No, Your Honor. But, I mean, with all due respect, on appeal, we picked the most clear – I mean, I picked the issues that I believe have the most merit. Right. There were other things that I saw, as I recall, and again – Yeah, but I mean, we can't – we can't – No, no. But that's why you get a complete resentencing. I mean, if you have – Because you think there's something – you get a complete – No, no, no. In the analogous situation, if you have a trial error, if counsel's ineffective at trial, we don't redo part of the trial. We do the whole trial. It's not analogous. Well, I would have to respectfully disagree. Okay. Go ahead. Your Honor, can I move on? If there's no further questions on that portion, I'd like to move to the loss. Mm-hmm. The problem with the loss calculation is that 85 percent of it, 84 percent of it, is based on an estimated value for the blank checks. He was awfully successful in converting his financial documents that he'd stolen into money. He was. But, Your Honor, the fundamental problem with this estimation is it's – ultimately, it boils down to its size and the lack of an adequate sample. The amount of completed checks, both that were negotiated, attempted to be passed, and which were just filled out and nothing had been done with them, there was 50 checks. And that's out of a total, I think it's 3,178. So it's 1.57 percent. In the analogous area of estimating drug quantity, and there's analogous provisions in the guidelines, 2D1.1 says if you don't have a drug seizure, you approximate the quantity. 2B1.1 says you can make a reasonable estimate of the loss. You know, when you have an estimate. Well, here if he hadn't gotten caught, the problem here is that, I mean, he was curtailed because he got caught. Of course. But most defendants are curtailed because they get caught. Yeah. And then you figure what he would have done had he not gotten caught. Right, Your Honor. But there are other – but that conflicts. If you always take it that – if you take it to its logical extreme, there's absolutely no limit. All right. So you're sort of levying a broadside attack. What should have been done? Well, in this case – What did the law require the judge to do? Okay. In this case, clearly the – certain of the intended losses were clearly applicable, like the $500 per credit card number. I calculated that the intended losses exclusive of the blank checks are about $291,000, while the actual losses were $58,000. At a minimum, the district court was required to substantially discount – Yeah. Okay. Now, here we go. How? How do you pick a discount figure? Prior authority. And if you look at other authorities – Prior authority? What was the basis in the record for making any kind of a discount? Right. Well, again, and this is another area where counsel did not lay out this argument, where it should have – Well, but what's your argument? My argument is it needs to be remanded to the district court to consider what kind of a discount is appropriate. How? How, how, how? Well, that's a difficult question. Well, I know. And so you say counsel didn't do it, but you can't do it either. I mean, in drug cases, all I can respond is by looking at prior authority. In drug cases, the district courts have simply adopted discounts of 50 percent. Well, time out. This isn't a drug case. You're asking us to see that there's – Okay. In other financial cases, the same – You know, if you don't interrupt me, I'll get my question out. You're saying, oh, this is a real problem. There should have been a discount. And you're asking us to send it back. And I'm asking you, okay, put some meat on these bones. And all you're telling me is, well, I don't know what to do either. Assume you're back there now. What do you do? How do you pick a discount figure? What do you base it on? A minimum of 50 percent. A minimum of 50 percent. Where does that come from, out of the air? No, it comes from out-of-circuit authority. And it comes from this case. Out-of-circuit authority, 50 percent? Yes. That's the kind of discounts that have been applied in drug cases. Look, I can't – You see, you're telling us there's a mistake here, but you can't tell us exactly what it is. Because this is a figure that, in some measure, cannot be perfectly identified. No, Your Honor. None of these figures can be perfectly identified. Perhaps – I mean, I would have to think of – I mean, if I were doing a resentencing, these are the kinds of things I would think about. I would look at the duration of the offense, which the district court didn't do. It was a three-month duration. I would try to figure out – I mean, okay, the actual loss over a three-month period was $58,000. You know, maybe it's appropriate to use that as a basis for estimating. Maybe. Maybe. Maybe. Well, maybe. There is no case law addressing this exact point, and that's part of the problem. Well, so if all of this is coulda, woulda, shoulda, been maybes, how is it that the district court made a mistake here in doing what it did? It seems that it's rational what it did based on this record. Rationality. You would have done something different. Maybe somebody else had done it. But this doesn't strike me as being irrational. Your Honor, it is irrational. It's taking the amount of intended loss beyond any level of intent. I mean, the fact that he was successful doesn't mean that – I mean, first of all, he got caught. He was going to get caught at some point. He was successful only in that he did it for a while. You know, this is not – I mean, the problem – I mean, look, also, my job is to identify what the district court did wrong. And the district court did not – Right. If I might interrupt for a second. I don't understand your statistical argument. I mean, you argue that it's a small sample size. Yes. So what sample size should have been used? You see, that's – sample size is a term of art in statistics, and I don't think your argument quite correlates. Well, Your Honor, this Court has said that a sample of 13 percent is okay in Scrivner. And the problem is – Scrivner? It didn't say a sample less than 13 percent was not okay. No, it did not. But the drug cases certainly have held that sample sizes that are particularly low, as this one is – are not sufficient. I mean, that's – I mean, this is something where the district courts clearly need guidance. What's the guidance? Well, I mean, the other way to do it, I mean, you could calculate the distribution of the amount of the checks. I mean, I don't think averaging is not necessarily a bad way, and it may have helped you, because you had a lot of checks that were in the thousands of dollars and some that were outliers on the low side, $63 or something like that. But, I mean, if you try to do it statistically, I think you end up in worse shape, perhaps, than you do under this. I don't think that's necessarily true, Your Honor. But even if you do – if you don't do it statistically, there are other things that were considered. One of the things I pointed out in my brief is that the number of blank checks, a lot of it was since he was stealing mail, he got boxes of checks. And the chance that he was going to be able to negotiate – I mean, or that he would even have tried to negotiate 200 checks off one account is about nil. So it was an under-multiplication in that area as well. I understand. I mean, I understand your argument. I understand that if you got it on remand, you would present different evidence and make a different argument. But what I have trouble with is how we can say on this record, just leaving aside ineffective assistance arguments, that the district court erred as a matter of law in doing what it did. What's your best case for that? The best case is that the district court – I don't have a – I mean, the guidelines clearly anticipate that averaging is okay on some level. But as a matter of law, as a matter of prior authority, every case that has adopted an averaging – that has averaged either has one of two things. Either they apply a discount or they have stronger evidence of direct intent. Well, you – Like there's that case – Excuse me for interrupting you, but the district court agrees – disagrees with you. But in my experience, there is far more information in this case than the other cases similar to this that I have seen that allows us to assign an amount to all of these blank checks.  And there's a lot more evidence here. And he's talking about the entire ball of wax, looking at this person, what this person did in the past, how successful the person was. And it just strikes me that the Court was very careful and came up with a rational way of assigning a value to that – to those instruments. But, Your Honor, if you look at cases like – even from the circuit like Koenig, where they assigned a $500,000 loss, the defendant himself indicated that's what he expected to get. Well. There's nothing like that here. Your time is expired. Thank you, Counsel. Thank you. We'll hear from the other side. Good morning, Your Honors. May it please the Court, Cynthia Valenzuela on behalf of the United States. Because the central issue in this case is the calculation of loss, I thought it would make sense to clearly set forth, articulate, and clarify the District Court's calculation of loss. The District Court calculated loss based on three different sources. The batch of mail that was found at the defendant's residence, the first batch of abandoned mail found on May 2, 2002, and the second batch of abandoned mail found on June 23, 2002. The total amount of loss from the mail found at the residence was $70,423.87. The total from the first abandoned batch of mail is $377,598.25. And the total from the second batch of abandoned mail is $1,345,555.50. If you add the three sources together, the total is actually $1,792,077.62. That's different from what the PSR set forth. PSR indicated that the total amount of loss was $1,796,844.64. That's the amount the District Court relied on. The correct amount is a little bit less. It's harmless error because it doesn't at all affect the dependency guidelines. I think that the biggest difficulty is the one that Ms. Landau identified of having, of counting at the same rate boxes of blank checks, which it's just highly improbable that a defendant would use. What is your answer to that? Well, Your Honor, I guess there's two responses to that. First of all, as the District Court found, this defendant was highly sophisticated, and if anybody could have done it, it would have been him. His level of sophistication was impressive. In the event that it was one of us, normal people, who probably may not be able to have exploited large numbers of blank checks, the sentencing guidelines and the case law is clear that the District Court's focus, as it was here appropriately, is to be on the defendant's intent, not on the economic probability. What was the evidence of intent on the checks, your best evidence, as opposed to the credit? The best evidence of intent is the totality of the evidence, specifically for the checks is the totality of the evidence. Right. I'm segregating the checks because that's the largest number. You've got boxes and boxes of checks. Well, I think the District Court looked at a number of things. The level of sophistication, the fact that this defendant made counterfeit postal keys to steal the mail, the fact that he called through the mail, that he established financial profiles, that he arranged those profiles into alphabetical order in folders and then in file boxes, the fact that he actually tapped into victims' telephone lines and activated credit cards from their own home telephones. All of which goes to show that he was, in fact, very sophisticated, but it's just sort of stupid to think that you could phony up 200 checks from the same person, isn't it? Well, Your Honor, I... If he's that sophisticated, I don't think he probably would have figured he could pull that off. I guess he got away with it before. He has a prior history of doing this. With the same individuals? Not the same individual. With the same victims. Yeah. I mean, you know, you get a new stash of checks from the bank and you've got several hundred checks in it. Right. Is there any indication that he could have pulled it off with all those checks? Well, as the District Court found, the defendant here, what he did do was he opened a checking account using a fake identity, basically identity theft, stole a victim's identity, used that identity to open a bank account, deposited, after he was released on bail, deposited a stolen check into that bank account and made several withdrawals from that bank account. So the fact that he could have ordered a box or boxes of checks and negotiated them against that account is highly likely. I don't think it's unreasonable at all for the District Court to have found that. The District Court's method of calculation I don't think is really a major issue here, but the District Court's calculation was appropriate. She applied a well-recognized and accepted method, which is averaging the known losses and applying those losses to the number of monetary instruments, multiplying the average by the number of monetary instruments. As Defense Counsel stated, that was a method that was accepted by this Court in the Scribner case and by the Fifth Circuit and the First Circuit, specifically in the context of blank checks in the Chappell and Robio cases. It's kind of a crude way of doing it, though, isn't it? I mean, you have, these checks are all over, I mean, the amounts are all over the map. You've got $10, you've got $9,000. I mean, as I said before, that may or may not inure to the benefit of the defendant if you do it with a little more sophistication, but averaging is a pretty rough tool, isn't it? That's correct, Your Honor, and I think that the District Court took that into consideration, and I think that's why she calculated the loss based on the 18 checks that the defendant had passed or attempted to pass. She used that smaller sample size instead of the 54 checks that actually had a face value. If she would have used those 54 checks to assign an average to the blank checks, it would have been about $1,200 as opposed to $491 that the District Court did apply. So I think she considered the fact that loss is sort of this amorphous idea and, as I say, applied a well-recognized and accepted method, the averaging, and then was cautious about what number she used to establish that average. Some of these checks were found in abandoned mail, is that right? That's correct. And of what significance is that? Well, the government would argue the significance is the defendant tried to discard the evidence, tried to get rid of the evidence, and I think that's pretty clear by the chronology in the case. Elaborate. The defendant was arrested on March 21st, released on bond on March 22nd, and then he was rearrested on April 16th. So between March 22nd and April 16th, there was significant activity with respect to the financial mail that was found in both of the abandoned batches of mail. And then upon defendant's arrest, of course, there's no activity, and we subsequently found the abandoned batches of mail after his second arrest. And some of it was organized alphabetically? That's correct. What does that suggest, an indication that that material was going to be used? That's correct, Your Honor, in conjunction with the fact that he had created false identity cards in the names of some of the victims whose mail was found in those abandoned batches of mail. Do you have anything you'd like to tell us about the ineffective assistance of counsel claim? As the government argued in its brief, Your Honor, we feel it's most appropriately raised in a 2255. We think the record would be complete by having a declaration from defense counsel. We simply don't know, as Your Honor stated earlier, why he decided not to move for a downward departure. Can you think of any reason? I mean, it seems to me, on sentencing, there's no strategic reason not to ask for a downward departure. Well, Your Honor, it's sort of related to the related cases issue. And so maybe he thought if I lose on the related cases issue, it's not worth it to argue the downward departure issue. We simply don't know. I mean, that's one plausible reason. How would that have been? I mean, you've been through a lot of sentencing. How could that have been a winning strategy? It just says I'm going to abandon it because I think I'll lose. I mean, normally I agree with you. I mean, these things should be developed on habeas. But it's hard for me to think why one wouldn't ask for a downward departure when one was available. Well, the district court made some statements, and it's possible that based on the statements that the district court made, the defense counsel thought it was a losing argument. I mean, we just don't know. That's why it's important to have the record fully developed, by getting a declaration from defense counsel. The district court remarked on defendant's propensity for recidivism. The district court remarked on the defendant's past criminal history, remarked on how that criminal history was very similar. No, I understand that. When you've got the district court going against you, isn't that when it's most important to make a record? Well, if I were defense counsel, that's probably what I would do. Okay, thank you. Thank you, counsel. You've used your time, but if there's anything you feel you have to tell us, go ahead. One point on the loss estimation. One way to consider how to calculate the loss as to the blank checks would be to consider whether the defendant had identities for any of these people, because clearly if he had identities for some of them, he might be more able to negotiate the checks. Lastly, on ineffective assistance, if counsel thought that he was going to lose and just didn't think it was, that's not a strategic reason. Strategic reason means there's a reason not to do something. Is there no such thing as honor? I'm sorry, I don't understand. Don't take your point. Well, if you go back and you read some of the great litigators of all time, when they talk about their cases, they say, don't waste your voice making stupid arguments that aren't going to get you anywhere, and don't try to pull the wool over a court's eyes, that if you consider that this departure isn't going to go anywhere. I agree, Your Honor. I do agree with that. Don't do it. I do agree with that, but this is not that case. It was a plausible related. If you're going to make a related argument, why not make the other? One question. I think you were guesstimating that you might offer evidence of intended loss of $300,000. How much difference would that make in the sentence? A lot. The 1.79 or 1. We'll just say 1.77 million. That resulted in an upward adjustment of 16 levels. If you went to the next level, which is between 400,000 and a million, it's down 2. And if you got below 400,000, it's down 4. And the sentencing range is. . . Okay. I understand. Okay. Thank you. Thank you. The case just argued is order submitted. We'll call United States v. Amit Kaul.
judges: Trott, Rymer, Thomas